IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>RODNEY GAINES,<br><br>Defendant | CRIM. NO. SAG-22-00125 |

**GOVERNMENT'S MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANT'S MOTION TO COMPEL**

The United States of America, by counsel, hereby responds to the motion by Defendant Rodney Gaines for an order compelling the disclosure of the identity of a confidential informant. ECF 639. The Court should deny the motion.

**INTRODUCTION**

Rodney Gaines is charged in a Third Superseding Indictment with the following crimes: conspiracy to distribute narcotics in violation of 21 U.S.C. § 846 (Count One); conspiracy to possess firearms in furtherance of a drug-trafficking crime in violation of 18 U.S.C. § 924(o) (Count Five); and two counts of possession with the intent to distribute cocaine (Counts Eight and Twelve). Trial is set for March 17, 2025.

In the instant motion, the Defendant asks the Court to require the government to disclose the identity of a confidential informant who was referenced in the initial state wiretap affidavit in this case. A copy of excerpts of the wiretap affidavit in question is attached as Exhibit 1 to this memorandum.[1] This wiretap sought authorization from a Judge of the Circuit Court for Carroll

---

1  Due to its length the government is attaching the first page of the affidavit and the sequence of pages cited in this memorandum. The government will certainly make the entire transcript available if the Court wishes to review it.

1

County to intercept and monitor communications by Rodney Gaines over two cellular phones: 717-677-1939 (designated the A-line) and 443-289-5722 (designated the B-Line). The supporting affidavit detailed a lengthy investigation into Gaines and his drug-trafficking organization.

In support of his request for disclosure, Gaines relies on a report describing a single piece of information apparently provided by the informant: that on one occasion the informant stated (following a call on the 717-677-1939 phone) that the call did not sound like Gaines and that other people sometimes uses the phone. The Defendant apparently believes that he should be allowed to discover the name of the informant so that the Defendant may elicit that particular piece of information, notwithstanding the overwhelming body of inculpatory information provided by the informant about Gaines's drug-trafficking activities. Although the defense articulates the informant's comment on that occasion as being solely exculpatory, the total context of the informant's statement (even on that particular occasion) reaffirmed that Gaines was a drug-dealer and the head of the organization in question (an image from the report in question, from discovery, is below):

2

> CI was searched before and after the controlled purchase, and was found to be free of any United States Currency, Controlled Dangerous Substances, or Paraphernalia. CI then contacted Gaines, contacting him on phone number 717-639-1939, to make the arrangement to purchase Controlled Dangerous Substance "Crack" Cocaine, a schedule II Drug, in my presence. I then gave CI the same US Currency mentioned above for this purchase. The CI stated he didn't believe it was Gaines voice on the phone number 717-639-1939 which he said is common for this drug trafficking organization to pass around the cell phone and it sounded more like Gaines number two, CI mentioned that earlier in the day number two will answer and Gaines will then take control of the phone again in the evening.

MSP Report (USA-6355). Thus, even with respect to this snippet of allegedly useful information, Gaines ignores the inculpatory aspect of the call: that even if the voice was not Gaines, it was Gaines's "number two" (which of course implies that Gaines was the "number one") and that during evening times "Gaines will then take control of the phone again in the evening." This is not exculpatory, even on its face.

It should be noted that the government does not plan to call the particular confidential informant at issue during trial. Thus, this is not a situation in which the Defendant is seeking pretrial disclosure concerning a person the government will actually be calling as a trial witness.

## ARGUMENT

A court considering a defendant's request for disclosure of the identity of a confidential informant must "balanc[e] the public interest in protecting the flow of information against the individual's right to prepare his defense." *Roviaro v. United States*, 353 U.S. 53, 62 (1957). Courts have recognized that the government's interests include the need to protect confidential informants and witnesses from intimidation and retaliation from criminals. *See United States v. De Los Santos*, 810 F.2d 1326, 1331 (5th Cir. 1987) (government's interest include safety of the informant as well as preserving informant's future usefulness as a source of information). In cases in which an informant is an "active participant in the transactions at issue instead of just a mere tipster, the failure to require disclosure of the informant's identity is more likely to amount to error." *United States v. Blevins*, 960 F.2d 1252, 1258 (4th Cir. 1992).

In this case, the government's interest in protecting the safety of the informant and in preventing unnecessary and unjustified harassment of the informant outweigh any interest Gaines may have in securing information from an informant (who, it should be noted, appears to be someone who would further *inculpate* the Defendant). Therefore, the Court should deny the motion to compel.

I.  **The Government Has an Overwhelming Interest in Protecting the Informant's Safety Due to Gaines's History of Threatening and Planning Retaliation Against Witnesses.**

Rodney Gaines has threatened to harm and harass witnesses in this case. He previously stated a desire to kill someone (to "smoke" that person) because he believed that the person had implicated him in a crime (putting Gaines's "name" in the witness's "mouth").[2] Given this history, the Court should deny Gaines's request for disclosure of the informant's identity.

On February 1, 2022, Gaines engaged in a phone call with a person who (at the time) was one of his co-conspirators. The call was intercepted and monitored on the wiretap then ongoing on Gaines's cellular phone at that time, 443-289-5722.[3] A copy of the transcript of the call is attached as Exhibit 2 and the audio recording of the call is being submitted with this memorandum as Exhibit 3. During the call, Gaines was irritated because he believed that a third party (a female

---

[2]  Gaines's threats toward that witness took place in the wake of the January 31, 2022 murder of Kevin King, Jr. Gaines apparently believed the female witness was implicating him in that murder. Although the government will not be presenting evidence of the murder in this case, Gaines's prior conduct of talking about wanting to harm ("smoke") a witness and his direct confrontation of that witness by text message remain the reality of his past conduct and are quite relevant in whether the Defendant's request for disclosure should be granted. Gaines's conduct in this case reflects obvious risks to any witness disclosed to Gaines.

[3]  Subsequent to the aforementioned Carroll County state wiretaps, the wiretap investigation continued pursuant to federal wiretap orders signed by the Honorable Deborah J. Boardman. The 443-289-5722 phone was "Target Telephone 1" of the federal wiretap.

4

associate of Gaines and other members of his circle) was implicating Gaines in connection with the recent murder of a man named Kevin King, Jr. Both Gaines and the co-conspirator expressed dissatisfaction with the fact that the third party was saying things and discussed what they were willing to do as a result. In chilling, explicit language, Gaines told his associate what would happen to the female if the female kept implicating Gaines:

> CALLER: Shorty out of order yo. She like, that shit made me mad. Like, you get somebody hurt like that. Don't do no shit like that, you talkin about sayin somebody owes some guys. They ain't never ever seen no mother fuckin shit like that--(unintelligible)…
>
> GAINES: You want her number so I can say somethin to her?
>
> CALLER: Yeah send it to me bro.
>
> GAINES: I'm about to give it to you right here on the phone. Ima read this link on her.
>
> CALLER: She outa order bro.
>
> GAINES: ***Tell that bitch i'll smoke her.***
>
> CALLER: Yeah doin shit like that, like yeah she outa order.
>
> [CALL CONTINUES CONCERNING FEMALE'S PHONE NUMBER]
>
> GAINES: ***Yo lean on her, some aggressive shit yo, like you gonna sweat her ass...***
>
> [CALL CONTINUES]
>
> CALLER: Alright, I'm ready to (unintelligible). Go ahead and tell me the number again.
>
> GAINES: You said do what? ***Don't be no ass for no trick, lean on that bitch.***
>
> CALLER: Yeah, that's why I'm sayin, I was gonna get her right here, shit...
>
> GAINES: Yall don't need to play them type games yo…

5

[PHONE NUMBER PROVIDED]

GAINES: ***Tell that bitch, don't put that motha fuckin name in her mouth nothing, tell that bitch you gonna smoke her dumb ass.***

CALLER: Alrighty. Yo I ain't gonna lie to you bro like, [unintelligible] what's his name. I ain't gonna lie to you, I can't wait to see her. She outa order.

GAINES: She what?

CALLER: I ain't gonna lie to you, she gonna get her muhfuckin head smacked boy you can't be doin no shit like that.

GAINES: Pointing fingers in directions and shit.

CALLER: Oh somebody could be makin up stories and shit that you never even seen or heard or nothin. Like you outa order.

GAINES: Like niggas had beef or somethin. I ain't got no beef. Nigga took something--called hisself taking my mother fuckin paper. I ain't even worried about that shit.

CALLER: No bullshit.

Exhibit 2 at 1-3 (emphasis added).

Gaines did not simply talk about confronting this woman; he confronted her directly to demand she stop talking about him. Gaines sent a text message directly to the woman in which Gaines demanded to know why the woman had his "name" in her "mouth" (language closely matching the language he had used during the above phone call). An image of the text exchange between Gaines and the woman is below:

6



The intimidation is clear and the threat is clear.  This was Gaines harassing and accusing a person for the offense of putting "my name in your mouth."  He warned her she might get "hurt."  He demanded to know "[w]hy you got my name in your mouth."  He demanded the woman stop talking about him: "Keep my name out your mouth."  By itself, the text exchange was obviously intended to harass and intimidate the woman.  When considered together with Gaines's statements during the earlier phone call in which Gaines talked about "smok[ing]" the woman, the text exchange is quite terrifying.

7

These communications evidenced[4] Gaines's willingness to harass, intimidate, harm, and/or kill a person because he believed her to be a witness. Gaines told an associate he would "smoke" the woman if she did not stop talking about him. Gaines told the woman directly that she had better keep his name out of her mouth. Thus, this is a case in which Gaines has already engaged in a blatant act of witness intimidation. That history substantiates the government's concern that disclosing further informant information to the Defendant has a high risk of leading to harassment or intimidation of that informant.

Gaines's efforts to speculate about the identity of witnesses and to attempt to pressure and influence witnesses has continued even during the pendency of this case. During a discovery hearing before the Honorable Matthew J. Maddox on February 6, 2023 (transcript attached as Exhibit 4 to this memorandum), the Defendant requested to have direct access to discovery in his case. Exhibit 4 at 4-5. In opposing that request, the government advised the Court that shortly after an earlier discovery conference with Judge Gallagher (on January 20, 2023), the Defendant had engaged in a phone call (recorded pursuant to standard jailhouse recording procedures) during which Gaines contacted one of his co-defendants through a three-way jail call. Exhibit 4 at 6. During the call, the Defendant tried to assess whether the co-defendant was cooperating and whether there would be any surprises with respect to the co-defendant. *Id.* Thus, even then the government was rightfully concerned about the Defendant's proclivity for trying to figure out who

---

4    During the recent February 19, 2025 status conference (ECF 643), when the government raised the issue of the Defendant's past tendency to intimidate witnesses (in connection with whether the Defendant should have personal possession of discovery), Gaines asked about whether there was proof. As discussed in this memorandum, the proof is found in the Defendant's own words and text messages concerning the woman he wanted to "smoke" for having his "name" in her "mouth."

was against him and not against him, a proclivity that made it unwise to allow Gaines to have personal possession of discovery. *Id.* at 6-7.[5]

In the face of that past misconduct concerning witnesses or purported witnesses, Gaines now seeks disclosure of an informant's identity. Even assuming some marginal help to Gaines from that informant identity (discussed further in the next section), the risks of disclosure are manifest here. Once he receives the informant's identity, Gaines may elect to contact and threaten the informant directly (as he did with the aforementioned woman he believed was talking about him). He may communicate to some associate his desire to "smoke" or otherwise harm the informant (again, as he has done already). He may enlist the help of a person inside his place of incarceration or he may contact someone by phone, perhaps by engaging in the kind of three-way calling techniques that he has also done already. Even if Gaines does not seek to do physical harm to the informant, his pattern suggests that he may subject the informant to intimidation or harassment by exposing their status as an informant to other people in the community. Such efforts at witness intimidation are a regrettably common feature in many drug-trafficking cases. In this case, Gaines has already engaged in that kind of witness intimidation.

---

5   It appears that the Defendant may have again attempted to contact this same person, known to him as a witness, by making a three-way call from his place of incarceration, the Chesapeake Detention Facility, on Saturday February 22, 2025. Gaines first contacted a female, who then three-way called the witness. Gaines did not make any threats to the witness, but ostensibly wanted the witness's help getting information about someone else that Gaines apparently wants to call as a witness. Even if the call was not overtly threatening, Gaines has a long pattern of engaging in intimidating contact with people he knows or believes to be witnesses. Moreover, it was likely a violation of Chesapeake Detention Facility rules for Gaines to make a three-way phone call from the facility.

   The government is providing discovery about this recent incident, including a report and a recording of the recorded jailhouse call, to the defense.

**II.     The Defendant's Interest in Disclosure is Minimal Because the Informant Has Provided Substantially Inculpatory Information Concerning Gaines.**

In contrast to the concrete considerations cutting against disclosure of the informant's identity due to Gaines's past pattern of intimidating witnesses, any interest that Gaines may have in disclosure of the informant's identity would be slight, or altogether non-existent.

As the A-line wiretap affidavit (Exhibit 1) makes clear, the informant provided a substantial body of inculpatory information about Gaines – that Gaines was a drug dealer, that Gaines sold drugs, that Gaines did drug deals over the cellular phone in question. Gaines's selective focus on a single statement by the informant does not change the overwhelming volume of inculpatory information provided by that informant about Gaines. Specifically:







12



All of this is powerful, inculpatory evidence proving that Gaines is a drug-dealer. Given the totality of the informant's information, any marginal help Gaines might elicit from the

informant would be vastly outweighed by the added evidence of his guilt. Notwithstanding the mass of inculpatory evidence available through the informant, Gaines seeks disclosure of the informant based on a particular occasion in which the informant stated that it was not Gaines's voice on a particular A-line phone call and that a different person used the cell phone. *See* ECF 639 at 2. Any exculpatory value to that information is vastly outweighed by the overall inculpatory information provided by the informant during the investigation. Given the totality of the informant's probable testimony, disclosing the identity to the Defendant would be unlikely to yield anything of actual value to the Defendant. What *would* be likely, given the history of this case, is that the informant would be needlessly subjected to the kind of harassment and intimidation already exhibited by Gaines during this case with respect to other people he believed to be talking about him.

Another consideration in *Roviaro* disclosure situations is whether an informant was an actual participant in the crime under indictment, as opposed to an informant who was simply used in the building of probable cause for a search warrant. Although the defense motion cites *United States v. Price*, 783 F.2d 1132, 1139 (4th Cir. 1984) for the proposition that a defendant is entitled to disclosure of an informant where the informant "participated in the crime" (ECF 639 at 1), this is not such a case here. As the wiretap affidavit makes clear, in this case the informant was a source of probable cause in the form of information pertaining to Gaines, for making monitored calls to Gaines, and for making controlled buys. However, the government is not presenting any of the controlled calls or controlled purchases in which the informant participated at trial. Accordingly, the wiretap informant here is akin to the kind of tipster informant who contributed to the building of probable cause for a search warrant, but who is not a participant in the indicted

offense being brought to trial.

It should be noted that the government has inquired with law enforcement and has acquired the name of the informant in preparing its response to this motion. The informant did end up getting intercepted during the course of the Gaines wiretaps. In order to minimize any concerns under *Roviaro* and to protect the informant from the risks of harm and intimidation discussed herein, the government will not be using any intercepted communication involving the informant during the trial.

For these reasons, and applying the *Roviaro* balancing test, the Defendant's need for this evidence is slight at best (and likely non-existent). This is an inculpatory witness whose information is patently adverse to the Defendant's case. Gaines is unlikely to secure anything useful from this witness that would not be outweighed by the witness's ability to testify about all of Gaines's drug deals during April and May 2021 – testimony that would certainly be helpful to the government's case but that would not be helpful to Gaines. The only thing likely to happen from disclosure is that Gaines will have someone else to harass and intimidate.

Thus, the government has a clear, concrete interest under *Roviaro* in protecting the informant from harm or intimidation at the hands of Rodney Gaines. Gaines, in contrast, has shown virtually no value from securing the identify of the information, who provides almost exclusively inculpatory information about him. The *Roviaro* balancing test favors denial of the Defendant's motion.

## CONCLUSION

For the forgoing reasons, the United States respectfully requests that the Court deny the Defendant's motion to compel.

Respectfully submitted,

Philip A. Selden
Acting United States Attorney


By:_____/S/_____
LaRai N. Everett
Michael C. Hanlon
Assistant United States Attorneys

36 South Charles Street, Fourth Floor
Baltimore, Maryland 21201
(410) 209-4895
Michael.hanlon@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 28th day of February 2025, a copy of the foregoing response was provided to Defendant Rodney Gaines, *pro se*, through his stand-by counsel Charles Burnham, Esquire.

_____/s/_____
Michael C. Hanlon
Assistant United States Attorney