IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    v.<br><br>RODNEY GAINES,<br>        *Defendant* | Case No. 22-cr-00125 |

**MEMORANDUM OPINION AND ORDER
REGARDING SPOLIATION JURY INSTRUCTION**

Before this case was transferred to me, Judge Gallagher ruled that Defendant Rodney Gaines was entitled to an adverse-inference jury instruction arising from the spoliation of certain text messages. ECF No. 616. This order first addresses the evidentiary issues, facts that evolved shortly before and during trial, and why such an instruction remained an appropriate remedy. This order also explains the Court's resolution of the dispute between the parties (ECF Nos. 608, 610) regarding the language for that jury instruction.

**Background**

The trial in this case was originally scheduled to begin September 3, 2024. *See* ECF No. 330. In the days before, it came to light that certain text messages between an investigating officer, Trooper James Ward, and two cooperating witnesses (J.S. and J.B.) had not been produced in discovery. ECF No. 616 (memorandum opinion of Judge Gallagher) at 4. Because of that issue, Mr. Gaines, who was at that time representing himself, filed a motion seeking to continue the trial. ECF No. 522-1; *see* ECF No. 616 at 4. The government initially opposed a continuance, ECF No. 524, but on September 5, before a jury was sworn, the parties jointly requested a continuance because the government advised that it had "just received 543 emails, totaling more than 24,000

pages, from the email account of its former case agent [i.e., Trooper Ward]." ECF No. 616 at 5. It also later came to light that there were "two categories of evidence that existed at one point but the Government [could] no longer access and produce from any source," namely two videos attached to text message exchanges between the trooper and a cooperating witness (A.W.), and Trooper Ward's text exchanges between January 21, 2022 and April 13, 2022 with another cooperating witness (J.B.). *Id.* at 5-6.

Mr. Gaines filed motions to dismiss, including on *Brady* and speedy trial grounds. ECF Nos. 578, 579. Those motions were based, in part, on evidence elicited at an evidentiary hearing held on September 19, 2024. ECF No. 563 (hearing); ECF No. 575 (transcript); ECF Nos. 564-66 (exhibit and witness lists). Judge Gallagher also held a hearing on the motions to dismiss on November 19, 2025. ECF No. 596 (hearing); ECF No. 631 (transcript). On November 25, 2024, Judge Gallagher issued a memorandum opinion denying the motions to dismiss; that version of the opinion (ECF No. 601) and order (ECF No. 603) were filed under seal (but served on the parties), and public, redacted versions were filed on January 2, 2025. ECF Nos. 616 & 617.

On the speedy trial issue, Judge Gallagher found that the latest delay—requiring the postponement of the trial from September—was the result of "the Government's failure to produce discovery material sufficiently in advance of the trial and its failure to preserve potentially discoverable material," a reason for delay that was "invalid." ECF No. 616 at 9. But Judge Gallagher held that the delay did not rise to the level of a "constitutional violation" based on an assessment of all the relevant factors. *Id.* at 10–12. Judge Gallagher concluded the speedy trial analysis as follows: "While this remains a close case, balancing all of these *Barker* [*v. Wingo*, 407 U.S. 514 (1972)] factors and the relative weights assigned to each, this Court still finds no constitutional speedy trial

2

violation in this case, placing the heaviest weight on the reasons for the delay, which continue to weigh in the Government's favor despite its recent contribution to additional unwarranted delay." *Id.* at 12.

Judge Gallagher proceeded to address Mr. Gaines's argument that even if there were no speedy trial violation, the Court "should dismiss the indictment because evidence produced at the September 19, 2024, evidentiary hearing shows that the government destroyed exculpatory evidence, thus violating Mr. Gaines's due process rights." *Id.* at 12 (citing ECF No. 578). Judge Gallagher explained the legal standard as follows:

> Proof of a due process violation based on a failure to preserve evidence requires two elements. First, the defendant must show that the missing evidence had "an exculpatory value that was apparent before the evidence was destroyed[] and [was] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *United States v. Perry*, 92 F.4th 500, 513 (4th Cir. 2024) (quoting *California v. Trombetta*, 467 U.S. 479, 489 (1984)). Second, the destruction of such exculpatory evidence by the Government only rises to the level of a constitutional violation if the evidence was destroyed in bad faith. *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). And bad faith is only present where the defendant can show that "the officer intentionally withheld the evidence for the purpose of depriving the [defendant] of the use of that evidence during criminal trial." *Jean v. Collins*, 221 F.3d 656, 663 (4th Cir. 2000); *United States v. Varner*, 261 F. App'x 510, 517 (4th Cir. 2008) ("[F]or due process concerns to arise…the destroyed evidence must have some exculpatory value that the agents recognized, and yet nevertheless destroyed."). Negligence does not constitute bad faith. *Elmore v. Osmint*, 661 F.3d 783, 831 (4th Cir. 2011).

*Id.* at 12-13 (alterations and omission in original).

Applying that standard, Judge Gallagher held as follows. First, with respect to the two videos attached to certain text messages, there was "no evidence that the two missing videos contain content that would be of an exculpatory nature, or even a meaningfully different nature than the preserved exchanges." *Id.* at 13. Second, as to the missing text messages between the officer and cooperating witness J.B., "even if the texts contained the exculpatory content Mr. Gaines suggest that they might (promises made by [Ward] that J.B. would not go to jail if he 'gets Gaines'), Mr. Gaines has comparable evidence: the 2023 Letter [ECF No. 578-3], handwritten from J.B. to the prosecutor, describing those same representations." *Id.* And "the handwritten letter itself constitutes compelling impeachment material." *Id.* Moreover, Judge Gallagher held, "this Court is unpersuaded that he has adduced sufficient evidence of intentional conduct to destroy the text exchanges." *Id.* at 14. Although Mr. Gaines had "quite properly note[d]" that the credibility of the officer in question "has been gravely undermined in other contexts and . . . suggest[ed] that [his] testimony is questionable in this case because of J.B.'s 2023 letter suggesting that [redacted] had made him promises that went unfulfilled," Judge Gallagher held that Mr. Gaines had not "met his burden to show bad faith conduct." *Id.*

"Of course, the onus was on the Government to have better procedures for the preservation of evidence from its multitude of law enforcement sources, and it has failed in that task," Judge Gallagher explained. *Id.* at 15. And thus, although there was no "due process or *Brady* violation," Judge Gallagher held that Mr. Gaines could request, and the Court would consider, certain "mechanisms short of dismissal" in order to "ensure that Mr. Gaines's defense will not be unfairly impaired by the missing chain of texts," such as "precluding the Government's use of J.B. as a witness, restricting the scope of

4

the Government's examination of J.B. about the 2023 Letter, or instructing the jury that an adverse inference can be drawn from the fact that the Government failed to make the texts available." *Id.*

Mr. Gaines invoked the last option, requesting "a spoliation instruction addressing the absence of the text messages." ECF No. 608 at 1.[1] Specifically, Mr. Gaines requested the following instruction, which he contends is "adapted from [*United States v. Johnson*, 996 F.3d 200 (4th Cir. 2021)] to the particular facts of this case":

> If you find that the government could have produced evidence and that this evidence would have been material in deciding facts in dispute in this case, then you are permitted, but not required, to infer that this evidence would have been favorable to the defendant. For example, you are permitted but not required to infer that [J.B.'s] deleted text messages would have shown that [Ward] promised [J.B.] he could avoid prison in exchange for offering falsely inculpatory information and testimony against Rodney Gaines.

ECF No. 608 at 1-2.

The government stated that it "does not object to the issuance of an appropriate jury instruction" but did object to "the particular language proposed by the defense." ECF No. 610 at 1. The government in particular objected to the last sentence in Mr. Gaines's proposed instruction (beginning "For example"), which the government contended was not "necessary or advisable" and could be interpreted as the Court "endors[ing] the specific interpretation of evidence advanced by the defense." *Id.* at 2. Instead the government proposed a spoliation instruction "based on the form

---

[1] When asked again during a final pretrial conference on March 14, 2025, Mr. Gaines again declined to seek any remedy other than dismissal or an adverse inference instruction, and specifically disclaimed any request that J.B.'s testimony be excluded.

5

instruction for 'Party's Failure to Produce Evidence' (Instruction 75-7) found in the civil version of *Modern Federal Jury Instructions*." *Id.* As modified to conform the language to a criminal rather than civil case, the government proposed the following instruction:

> You have heard testimony about evidence which has not been produced. Counsel for defendant has argued that this evidence was in the government's control and would have proven facts material to the matter in controversy.
>
> If you find that the government could have produced the evidence, and that the evidence was within the government's control, and that this evidence would have been material in deciding among the facts in dispute in this case, then you are permitted, but not required, to infer that the evidence would have been unfavorable to the government [*or alternatively,* <u>favorable to the defendant</u>].
>
> In deciding whether to draw this inference, you should consider whether the evidence not produced would merely have duplicated other evidence already before you. You may also consider whether the government had a reason for not producing this evidence that was explained to your satisfaction. Again, any inference you decide to draw should be based on all of the facts and circumstances in this case.

*Id.* at 1-2 (based on Modern Federal Jury Instructions–Civil, Instruction 75-7).

Judge Gallagher "decline[d] to finalize [her] ruling" on which instruction or other mechanism would be appropriate, and gave Mr. Gaines "an opportunity to propose his preferred mechanism" and the government an opportunity to respond. ECF No. 616 at 15; *see also* ECF No. 615 (letter order from Judge Gallagher stating, "I will be consulting with Judge Abelson to resolve the currently pending pretrial matters, including the issue relating to the appropriate jury instruction addressing the missing discovery.").

Then, in mid-March, Mr. Gaines filed a renewed motion to dismiss on the *Brady* spoliation issue. ECF No. 678. He argued that certain statements that J.B. reportedly

made during a recent trial preparation session with government counsel established (1) that "the exculpatory value of the lost evidence" (*i.e.*, the lost J.B.-Ward text messages) was "apparent at the time Trooper Ward destroyed it," *id.* at 5,[2] and (2) that the 2023 letter from J.B. is not "comparable" to the missing text messages, in part because J.B. contended that the alleged promise from Ward was made in text messages that have not been recovered. *Id.* at 2, 5.

During a final pretrial conference on March 14, 2025, the Court inquired whether the government had examined the devices that Trooper Ward and J.B. used to send text messages to each other, and whether the messages continued to exist on those devices. The government reported that neither device was in government custody. The government then made additional investigation to determine whether those devices still existed. That further investigation led to a cell phone that J.B. used during that time period coming into the government's custody on or about March 23, 2025. That device contained some text messages between J.B. and Trooper Ward during the January-April 2022 time period. At least according to the government's initial review at the time of the phone's discovery, none of those messages contained a promise to J.B. about his cooperation. The government shared the most pertinent text messages from J.B.'s phone with the defense in PDF form and then performed a full forensic extraction of the phone, which was produced to the defense on or about the morning of March 26.

The Court's inquiry about the whereabouts of the phone that Trooper Ward had used to send and receive text messages with J.B. led to a series of discoveries. On the

---

[2] In the renewed motion to dismiss, Mr. Gaines also argues that Judge Gallagher applied the wrong legal standard. *See* ECF No. 678 at 3-5. As explained below, the Court disagrees, but regardless, Mr. Gaines is not entitled to dismissal.

morning of March 26, the government reported that that phone may still exist (which, if true, would have contradicted Trooper Ward's testimony at the September 2024 evidentiary hearing that every MSP-issued phone was turned in, wiped, and sold or destroyed). *See* ECF No. 575 at 34-35, 74-75. The defense asserted that the rediscovery of the phone no longer presented a spoliation issue, but rather a "classic Brady suppression question." The defense argued that the phone likely contained relevant information beyond the Ward-J.B. text messages, including Trooper Ward's communications with other cooperating witnesses. and requested an evidentiary hearing on the issue of Trooper Ward's phone.[3]

      The Court held an evidentiary hearing on Friday, March 28 about whether and how Trooper Ward's phone and its data were (or were not) preserved. *See* ECF No. 709. During that hearing, four witnesses testified. *Id.* Trooper Ward was the first witness. He testified that he received a new MSP phone in December 2023 and his old phone should have been wiped and destroyed. ECF No. 773 at 4. He testified that he had no recollection of what he did with his old phone, and that he did not recall putting his old phone in an evidence envelope. *Id.* at 5-6. He stated that the contents of the old phone were not transferred to the new phone. *Id.* at 6. He testified that he was suspended in January 2024 and did not have access to any of his office spaces following his suspension. *Id.* at 8. He stated after being asked recently to look for his old phone, he searched his house but did not find it. *Id.* at 9-10. Trooper Ward testified that at some point, he indicated that the phone needed to be kept for evidence, but the actual process

---

[3] Trial testimony proceeded on March 27, but the Court granted the defense's request for a delayed start to allow defense counsel and Mr. Gaines to review together the recently produced text messages from J.B.'s phone.

of seeking an exemption from the policy requiring all MSP-issued phones to be turned in was, to his understanding, completed by his supervisor. *Id.* at 29-32.

The second witness was Victor Hodgin, a sergeant with the Maryland State Police and Trooper Ward's former immediate supervisor. *Id.* at 46-47. Sergeant Hodgin testified that he was recently contacted to search for Trooper Ward's old phone. *Id.* at 48. He stated that he reached out to Tom Bonin of the MSP IT department "to figure out the status of that phone." *Id.* at 49. He also confirmed with Sergeant James Cooper of the computer crimes lab that the phone was not dropped off or the data downloaded and the phone was not in the lab. *Id.* at 49-50. Sergeant Hodgin also testified that he called Trooper Ward, who "said that he had put [the phone] in a white evidence envelope . . . and it was somewhere within his items at work." *Id.* at 50. Sergeant Hodgin stated that he had made phone calls to try to locate the phone, but had taken no other steps to search for it. *Id.* at 51.

The third witness, Thomas Bonin, Communications Services Manager in the IT department of the MSP, testified that from early 2023 to early 2024 he was involved in the process of adding a security product to all MSP phones. *Id.* at 63-64. The product would allow the MSP to remotely lock or wipe a device if it was lost. *Id.* at 64. Mr. Bonin testified that in two situations, troopers were permitted to keep their old phones; one of those exemption requests was with respect to Trooper Ward's old phone. *Id.* at 65. "[W]e made that exemption to issue him a new phone, just taking the cellular service off the old phone, and allowed him to take the old phone with him." *Id.* at 65. Mr. Bonin also testified about documentation indicating that, as of December 2023, Trooper Ward took the old phone with him. *Id.* at 73. Mr. Bonin also created in preparation for the hearing a screenshot from the security product system. The screenshot showed that

9

Trooper Ward's old phone had last been active in late September 2024—within a few days following Judge Gallagher's evidentiary hearing. Specifically, Mr. Bonin stated that the phone had "checked in" with the security product system, which "typically happens at power on if it connects to wifi or still has cellular connection on it," approximately 185 days and 17 hours from the time that the document was printed out the previous day. *Id.* at 76. Mr. Bonin also testified that the security product system does not have location tracking/GPS service. *Id.* at 76-77. On cross-examination, Mr. Bonin confirmed that the fact that there have been no other check-ins since that "check in" date is "most likely" "an indication it hasn't been turned back on" since then. *Id.* at 82.

The final witness was Michael Bonczewski, an MSP lieutenant and Trooper Ward's current supervisor. *Id.* at 86-87. He testified that he had recently been asked to contact Trooper Ward "to locate a phone that was needed for trial." *Id.* at 88. According to Lieutenant Bonczewski, Trooper Ward said he believed Tom Bonin would have had it. *Id.* at 89. After that call, Lieutenant Bonczewski called Mr. Bonin, called Trooper Ward again, searched the three locations where Trooper Ward had offices, asked an MSP colleague to review evidence from another administrative case involving Trooper Ward, and asked another colleague to search the property room (including the logs and records) at one of the locations where Trooper Ward worked. *Id.* at 88-91. None of these efforts uncovered the phone or an envelope that could contain the phone. *Id.* at 92.

The Court invited the parties to file briefs over the weekend based on the evidence from the evidentiary hearing. The government filed a supplemental memorandum concerning spoliation issue, ECF No. 717, and the defense filed a renewed motion to dismiss for speedy trial violations, ECF No. 719.

But more information about Trooper Ward's phone continued to emerge. Late in the afternoon on Monday, March 31, the government informed the Court that, following the March 28 evidentiary hearing, the Maryland State Police sought to gather data from Trooper Ward's current state-issued phone and discovered that there was a possibility that some or all of the data from Trooper Ward's *old* phone, which he had used during the investigation, existed in an iCloud backup. (The record is unclear about why reviewing the new phone led to discovery of that iCloud backup, or why the government had not discovered the iCloud backup earlier.) Based on an estimate that the data from the phone could be collected as early as the following morning—*i.e.* that having produced copies on J.B.'s phone of text messages between J.B. and Ward, the government would now be producing the newly obtained data from Ward's phone, including his copies of text messages between Ward and J.B.—and a request from the defense to recess so that it could review the significant volume of data gathered from the phone, the Court decided that the jury would also not sit the following day, April 1, to allow the defense time to review the new data.

On the afternoon of April 1, the Court held a status conference about the newly discovered data from Trooper Ward's phone. The government reported that it had provided certain communications to the defense, including messages between Trooper Ward and J.B., as well as messages between the Trooper and J.B.'s girlfriend (through whom J.B. had apparently been communicating). The government had also provided a full extraction to the defense for attorney's eyes only. Although there were some new messages, there were no communications from Trooper Ward to either J.B. or J.B.'s girlfriend about promises related to his cooperation. The defense requested more time to review the data, particularly in light of the attorney's-eyes-only limitation, which

11

prevented defense counsel from conferring fully with Mr. Gaines. To expedite the review process, the government agreed during the hearing that any communications between Ward and a cooperator could be shared with Mr. Gaines. The Court directed the government to make efforts to identify from the phone data material that may be pertinent "in parallel" with the defense's efforts. The Court continued to reserve its ruling on the question of whether to issue an adverse inference jury instruction, and its precise wording, given the evolving evidentiary developments.

The Court sent the parties the final language of the adverse inference jury instruction via email on the evening of April 2. See Discussion section, *infra*, for the final language. The Court instructed the jury on April 3 and the jury returned a verdict that evening.

## Discussion

There are two general categories of spoliation-based *Brady* claims, depending on how "apparent" it was at the time the evidence at issue became unavailable that the spoliated evidence would have had "exculpatory value." *California v. Trombetta*, 467 U.S. 479, 489 (1984). The first type of spoliation-based *Brady* claim arises where (1) spoliated evidence "possess[ed] an exculpatory value that was apparent before the evidence was destroyed," meaning that it "might" have been "expected to play a significant role in the suspect's defense," and (2) the evidence was "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id*. In those circumstances, a spoliation-based *Brady* claim does not require proof of "bad faith on the part of the police." *Johnson*, 996 F.3d at 217 (4th Cir. 2021) (quoting *Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988)).

The second type of spoliation-based *Brady* claim arises where "no more can be said" than that the evidence "might have exonerated the defendant." *Youngblood*, 488 U.S. at 57. In that circumstance, *i.e.*, where it was *not* "apparent" at the time the evidence became unavailable that the spoliated evidence would have had "exculpatory value," *Trombetta*, 467 U.S. at 489, the Supreme Court has held that a defendant asserting a constitutional spoliation claim *is* "requir[ed] . . . to show bad faith on the part of the police." *Youngblood*, 488 U.S. at 58.

Under either type of spoliation-based *Brady* claim, a defendant can only show a due process violation if the evidence that was not preserved is "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Trombetta*, 467 U.S. at 489; *see also Johnson*, 996 F.3d at 206.[4]

Although the distinction between those two types of spoliation-based *Brady* claims can become blurry in some cases, the Fourth Circuit has explained that the distinction arises because adverse inferences based on spoliation are generally limited to circumstances "where there is 'a showing that the party knew the evidence was relevant to some issue at trial and that his willful conduct resulted in its loss or destruction.'"

---

[4] In *Johnson*, the Fourth Circuit referred to the "comparable evidence" rule specifically in a sentence referring to the first type of spoliation-based *Brady* claim. *See* 996 F.3d at 206. Mr. Gaines contends that insofar as a defendant asserts the second type of spoliation-based *Brady* claim, the existence of comparable evidence is irrelevant to whether a due process violation has been shown. *See* ECF No. 678 at 3. Not so. In *Trombetta*, the Supreme Court explained that the "comparable evidence" element for any spoliation-based *Brady* claim goes to whether a defendant has shown "constitutional materiality." 467 U.S. at 489. Materiality is an element of either form of spoliation-based *Brady* claim. *See, e.g.*, *Youngblood*, 488 U.S. at 57 (explaining that a *Brady* claim arises from the government's "fail[ure] to disclose to the defendant *material* exculpatory evidence") (emphasis added).

*Johnson*, 996 F.3d at 217 (quoting *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995)). Applying that principle to the context of spoliation in a criminal case, "'a finding of bad faith *suffices* to [support a due process spoliation claim] but '*is not always necessary.*'" *Id.* (emphasis added) (quoting *Vodusek*, 71 F.3d at 156). Specifically, a showing of bad faith is *not* necessary where spoliated evidence "possess[ed] an exculpatory value that was apparent before the evidence was destroyed," *Trombetta*, 467 U.S. at 489; *see Johnson*, 996 F.3d at 217. Bad faith *does* need to be shown, however, in cases where "no more can be said" than that the evidence "might have exonerated the defendant," in other words that the evidence would only have been "potentially useful" to the defense. *Youngblood*, 488 U.S. at 57, 58; *see Johnson*, 996 F.3d at 217. The requirement that a defendant prove bad faith in the latter context "limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, *i.e.*, those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." *Youngblood*, 488 U.S. at 58.[5]

---

[5] The government has contended that "bad faith" is inherent in both types of spoliation-based *Brady* claims because where evidence has been destroyed that "possess[ed] an exculpatory value that was apparent before the evidence was destroyed," *Trombetta*, 467 U.S. at 489, that at least implies that such destruction, or loss, was the result of bad faith. That point has logical force, and perhaps one way of looking at the first type of spoliation-based *Brady* claim is that bad faith is presumed in such circumstances. Regardless, the Fourth Circuit has made clear that a party seeking to make out that first type of spoliation-based *Brady* claim need not put forward any evidence of bad faith. *See Johnson,* 996 F.3d at 217 (explaining that bad faith "suffices" to support a due process spoliation claim but "'is not always necessary'") (quoting *Vodusek*, 71 F.3d at 156).

As Judge Gallagher held, Mr. Gaines's spoliation-based *Brady* claim to dismiss based on the missing text messages fails for two independent reasons.

First, "he is unable to show an inability to obtain comparable evidence by other reasonably available means." ECF No. 616 at 13. That requirement of showing "inability to obtain comparable evidence" by other means applies to both types of claims above, *i.e.*, whether the exculpatory nature of the evidence was "apparent" (under *Trombetta*) or the evidence merely "might have exonerated" the defendant (under *Youngblood*). Here, the "comparable evidence" in the form of the 2023 handwritten letter from J.B. to the prosecutor, although "not identical to having the four months of text messages that possibly might corroborate such conversations," was "clearly 'comparable' in its impeachment value." ECF No. 616 at 13.

Second, Judge Gallagher found that Mr. Gaines had not shown that the text messages "possess[ed] an exculpatory value that was apparent before the evidence was destroyed," meaning that they "might" have been "expected to play a significant role in the suspect's defense," *Trombetta*, 467 U.S. at 488. *See* ECF No. 616 at 14. That meant that Mr. Gaines was only entitled to spoliation-related *Brady* relief if he could show "bad faith on the part of the police," *Youngblood*, 488 U.S. at 58. *See* ECF No. 616 at 14. And Judge Gallagher also found, after an evidentiary hearing, that Mr. Gaines had not "adduced sufficient evidence of intentional conduct to destroy the text exchanges." *Id*.

For these reasons, the loss of the text messages did not justify dismissal of the charges against Mr. Gaines.

In his renewed motion to dismiss, Mr. Gaines contends that Judge Gallagher committed "clear legal error" by requiring that Mr. Gaines prove bad faith. ECF No. 678 at 3-5. Judge Gallagher did describe bad faith as a "element[]" of his claim. ECF No. 616

15

at 12. Mr. Gaines is correct that bad faith would not be an element if the missing text messages had "apparent" "exculpatory value" at the time the Maryland State Police cell phones were upgraded. *See Trombetta*, 467 U.S. at 489; *Youngblood*, 488 U.S. at 57. But none of that affected the outcome of Judge Gallagher's analysis, which turned principally on the finding that Mr. Gaines could not "show an inability to obtain comparable evidence by other reasonably available means," given that Mr. Gaines could cross-examine J.B. at trial with his own words in his 2023 letter. ECF No. 616 at 13. That meant Mr. Gaines's *Brady* claim failed regardless of which of the two types of such claims was asserted.

This Court does not disturb those findings, which were clearly justified based on the record. The Court further concludes that the alleged "new evidence," ECF No. 678 at 3, does not justify a different result. Specifically, the "new evidence" Mr. Gaines contends justifies dismissal on *Brady* grounds is an assertion by J.B. in the lead-up to trial that the promise he referenced in the 2023 letter was made by Ward in a text message. Following a trial preparation session with J.B., the government wrote the following to Mr. Gaines's counsel:

> [J.B.] indicate[d] that text messages with Trooper Ward included discussions during which Trooper Ward would make promises or would discuss with [J.B.] that he would receive more lenient treatment in connection with his case and/or would not spend a day in jail (that is a paraphrase), and/or that the prosecutor was on board with such an arrangement.

ECF No. 678 at 2 (quoting email from government counsel).

Mr. Gaines argues that the Court should accept as true J.B.'s assertion that such promises were not only made, but were made in "text messages with Trooper Ward." *Id*. He argues that if those promises were in fact made in text messages, and if those text

messages were among those that the government failed to preserve, that establishes that (1) the text messages' exculpatory value *was* apparent at the time they were lost, and (2) the 2023 letter was not "comparable" to the missing text messages, because being able to show a jury text messages with an explicit promise from Trooper Ward that J.B. "would not go to jail if he 'gets Gaines,'" ECF No. 616 at 13, would be more powerful impeachment than using J.B.'s own words in his letter. ECF No. 678 at 5.

In addition, the defense has argued that the handling of Trooper Ward's phone and its data provide independent support for the motion to dismiss. ECF No. 719 (sealed defense motion). Specifically, the "obvious relevance of the materials on the phone combined with the case agents' record of dishonesty and misconduct in this case supports a conclusion that the lost materials were exculpatory," as well as an inference that the nondisclosure of the phone data was in bad faith. *Id.* at 3-4.

The Court does not see the statement by J.B. shortly before trial as materially changing the analysis, regardless of which type of spoliation-based *Brady* claim has been made. Mr. Gaines had ample material with which to attempt to impeach J.B.'s testimony based on the supposed promise that Ward made to him. J.B. asserted himself, in a letter to government counsel, that Ward had promised he would "not go to prison or stay in jail long at all" if he helped "bring Butter (Rodney Ga[i]nes) down." ECF No. 578-3 at 9, 8. Even assuming (without deciding) that J.B.'s assertion about the promise being made in a text message is plausible, that would not tip the *Brady* analysis across the line to render the 2023 letter not "comparable" within the meaning of *Johnson* and the related cases. Simply put, Mr. Gaines is not entitled to dismissal of this case based on the missing text messages between Trooper Ward and J.B.

That conclusion is even further buttressed by the discovery of text messages on the phone that J.B. appears to have used to correspond with Trooper Ward during the time period, which has further at least ameliorated any prejudice that may have flowed from the Maryland State Police's failure to preserve the text messages in the first instance.

Nonetheless, because the government lacked sufficient "procedures for the preservation of evidence from its multitude of law enforcement sources," as Judge Gallagher found, ECF No. 616 at 15, a curative instruction was justified. After all, "[e]ven absent a due process violation, a criminal defendant may be entitled to an adverse inference instruction pursuant to the spoliation of evidence rule." *Johnson*, 996 F.3d at 206. In his concurrence in *Youngblood*, Justice Stevens articulated the importance of such adverse-inference instructions in appropriate circumstances. In *Youngblood*, the evidence that was lost may have been preserved if the victim's clothing had been refrigerated after the crime and if a swab of biological material had been promptly tested. 488 U.S. at 58. There, the trial judge "instructed the jury: 'If you find that the State has . . . allowed to be destroyed or lost any evidence whose content or quality are in issue, you may infer that the true fact is against the State's interest.'" *Id.* at 59-60 (Stevens, J., concurring) (omission in original). "As a result, the uncertainty as to what the evidence might have proved was turned to the defendant's advantage." *Id.* at 60. And the fact that the defendant was convicted meant that "no juror chose to draw the permissive inference that proper preservation of the evidence would have demonstrated that the defendant was not the assailant," which "suggest[ed] that the lost evidence was 'immaterial.'" *Id.*

18

Against this backdrop, and on the current record, the Court concluded that a combination of the parties' respective proposals, and the instruction in *Trombetta*, provides an adequate remedy. The Court instructed the jury as follows:

> *Non-Produced Evidence*
>
> You have heard about some evidence that the defense contends may have once existed but was not preserved or produced, and that, if preserved and produced, would have proven certain facts. If you find that the government could have produced the evidence, and that the evidence was within the government's control, and that this evidence would have been material in deciding among the facts in dispute in this case, then you are permitted—but not required—to infer that the evidence would have been favorable to the defendant.
>
> In deciding whether to draw this inference, you should consider, for example, whether the evidence not produced would merely have duplicated other evidence already before you. You may also consider whether the government had a reason for not producing this evidence that was explained to your satisfaction. Again, any inference you decide to draw should be based on all of the facts and circumstances in this case.

By the conclusion of trial, the government had in fact produced text messages between J.B. and Ward. In large part, and perhaps entirely, there no longer remained a question about what those text messages stated. But the government remained unopposed to a spoliation instruction, and to avoid any remaining prejudice to Mr.

Gaines from the (very belated) collection and production of those text messages, a spoliation instruction was appropriate.[6]

Date: July 7, 2025

Adam B. Abelson
United States District Judge

---

[6] Mr. Gaines also raised a concern during trial that pole camera footage for certain periods of time was not preserved. ECF No. 667; ECF No. 674 at 3-5. Mr. Gaines argued that if all of the footage from pole cameras in this investigation had been preserved, it would have shown that certain people other than Mr. Gaines were involved in some of the drug transactions at issue in this case, in particular transactions on August 25 and September 17, 2021. ECF No. 674 at 4-5. The evidence in the record does not establish a spoliation-based *Brady* claim with respect to the pole camera footage based on the relevant legal standards set forth above. It appears that, when operational, the pole cameras used in this investigation were running 24/7. There apparently is no dispute that the 24/7 footage was not retained; instead, investigators would periodically flag footage to retain, and remaining footage would be deleted or overwritten. The Court does not decide one way or the other the appropriateness of those procedures from a preservation or *Brady* perspective. But what is clear on the present record is that Mr. Gaines has not shown that any of the footage that was not retained "possess[ed] an exculpatory value that was apparent before the evidence was destroyed." *Trombetta*, 467 U.S. at 489. As discussed above, that means Mr. Gaines, to make out a spoliation-based *Brady* claim, would have to "show bad faith on the part of the police," *Youngblood*, 488 U.S. at 58, as well that footage that was not preserved is "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Trombetta*, 467 U.S. at 489; *see also Johnson*, 996 F.3d at 206. Regardless of whether "comparable evidence" exists, there is no evidence in the record of any bad faith with respect to preservation of pole camera footage. Mr. Gaines's motion to dismiss based on the absence of certain pole camera footage (ECF No. 667; ECF No. 674 at 3-5) and his motion for discovery sanctions related to the pole camera footage (ECF No. 653) will also be denied (by separate order).